Edward SMITH, Plaintiff,

v.

Eldon T. ANSON, et al., Defendants.

Civ. No. 88–4253.

United States District Court,
S.D. Illinois.

Aug. 20, 1992.

Richard Shaikewitz, Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, Alton, Ill., for plaintiff.

Richard A. Green, Thomas Schwartz, Feirich, Schoen, Mager & Green, Carbondale, Ill., Jeffery Glass, Hinshaw & Culbertson, Belleville, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Senior District Judge:

This matter is before the Court on cross-motions for summary judgment (Document

Nos. 70, 75, 85) and on two motions for judgment on the pleadings (Document Nos. 101 and 103). The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) based upon diversity of citizenship of the parties and an amount in controversy exceeding $50,-000.

## I. FACTS

In 1966, plaintiff Edward Smith purchased approximately 464,700 acres of Brazilian land from Maneol Berilo Gomes Dias. The land, which is known as Fazenda Pratinha, is located in the state of Bahia about 200 miles from the Brazilian capital of Brasilia. The purchase was recorded on January 16, 1967, in the Office for Registration of Real Estate and Mortgages in the county of Barreiras, Bahia, with the following chain of title:

a) Transferee Edward Smith obtained the land by purchase from Manoel Berilo Gomes Dias in accordance with a public deed of purchase and sale dated December 10, 1966;

b) Transferor Manoel Berilo Gomes Dias obtained the land from the estate of decedent Jose Vicente de Matos and his wife in accordance with a Letter of Adjudication issued in the City of Damianopolis, Goias, on November 3, 1966.

*See* Plaintiff's Appendix, Document No. 86, at 6–7; Defendants' Exhibit B Attached to Affidavit of Keith Rosenn, Document No. 70.

Shortly after Smith purchased Pratinha, many Brazilian citizens began complaining about foreigners acquiring large tracts of their native land. As a result, the Brazilian government passed laws making it difficult for foreigners to acquire and maintain land in that country. The state of Bahia also began investigating allegations that title to certain lands within its jurisdiction had been fraudulently created. Pratinha was among the lands in question.

The state investigation eventually led to criminal charges against Maneol Berilo Gomes Dias and 32 other defendants. The indictment accused the defendants of participating in an elaborate scheme to create fake land titles through summary probate proceedings. Defendants' Exhibit A Attached to Reply Affidavit of Keith Rosenn, Document No. 112. The indictment alleged, *inter alia*, that Maneol Berilo Gomes Dias falsified the title to Pratinha on behalf of a former legislator, Gerson de Castro Costa. *Id.*

The case was heard by the Tribunal of Justice of Goiás, which convicted Maneol Berilo Gomes Dias and sentenced him to four years and eight months in prison. The court's decision, issued on September 27, 1978, contains the following paragraph:

In truth, Maneol Berilo fitted in perfectly in the fraudulent schemes of the fake lawyer Osiris, well advised by the "lawyer" Severiano. With him Berilo traveled to Taguatinga, for the purpose of requesting three summary probates processed there, including the ones referred to the deceased Manoel Lopes da Paixao and Vitoria da Paixao (the lands "Itaguari", "Pratudao") (Pgs. 474/508 3d vol.). It was Berilo who presented Osiris to Gerson de Castro Costa, so that the latter might enter into the real estate deals. From this resulted the summary probate referring to Miquel de Souza and Ana Maria de Souza, judged on December 26, 1966, by the municipal judge of Damianopolis, and whose petition was based upon false certificates (docs. of pgs. 809/812, 4th vol.). The same Berilo requested, in the subdivision of the judicial district of Damianopolis, the summary probate of the property "Praínha", included in the estate of Jose Vicente de Matos and Pracheda Bispo de Matos (pg. 586, 4th vol.).

Defendants' Exhibit C Attached to Affidavit of Keith Rosenn, Document No. 70, at 16. In translating this opinion, the defendants' expert inserted a parenthetical after the word "Praínha," as follows: "[sic: a typo; it should be "Pratinha"]." The plaintiff and his experts argue that the translator improperly interpreted the document. They insist that "Praínha" is correct. Thus, as discussed below, they argue that Maneol Berilo Gomes Dias was not convicted of fraud with respect to Pratinha, but in

connection with an entirely different piece of property.

Iraci Resende, the ex-municipal judge of Damianopolis, also was convicted for his role in presiding over the summary probate proceedings and was sentenced to four years and eight months in prison. Number six on the list of the summary probates for which he was convicted was as follows:

> 6) Decedents: Jose Vicente de Matos and Pracheda Bispo de Matos
>
> Requestors: Manoel Berilo Gomes Dias and his wife (atty. Joao Sombra do Norte Fontes and Severiano de Farias Filho)
>
> Property: Land "Pratinha" (S. Desiderio, Bahia).

*Id.* at 10–11. Gerson de Castro Costa, on the other hand, was acquitted. The court's judgment linked this defendant with Maneol Berilo Gomes Dias and Pratinha, stating:

> Manoel Berilo confirms that it was he who indicated to Congressman Gerson to buy the property "Pratinha". He said that it was a good deal. The property was probated in the name of Berilo, who, through his attorney Severiano de Faria Filho, requested the summary probate in Damianopolis. When the summary probate was finished, Berilo, at the request of Gerson, gave a power of attorney to Washington Vargas Laboisiere to sell the land, which was done.
>
> From what appears in the investigation, the heirs that figured in this summary probate (the decedents Jose Vicente de Matos and Pracheda Bispo de Matos) are fictitious or knew nothing of the inheritance.

*Id.* at 19. The court, however, found that the state had not proven that Gerson de Castro Costa had the fraudulent intent to commit the crime.

The land fraud investigation prompted the state of Bahia to bring a civil action against Maneol Berilo Gomes Dias and nine other defendants to nullify the registration of the fraudulently created titles and to recover the property for the state. The suit, filed on May 16, 1973, specifically refers to the following summary probate proceeding:

> *Decedents:* Jose Vicente de Matos and his wife D. Pracheda Bispo de Matos.
>
> *Requestors:* Manoel Berilo Gomes Dias and his wife in the status of assignees of the heirs of the decedents.
>
> *Property probated:* the Ranch "Prainha", in the county of Sao Desiderio, in the State of Bahia, with an area of 115,-000 hectares, and which was given in 1966, a value of 100 Cruzeiros.
>
> The ranch "Pratinha" was given the following description: starting from the division of the State of Goias, in a direct line until the source of the creek Pratinha, and from here downstream until it empties into the Riberao Triste e Feio [sad and ugly wide stream], and from here to the border of the State of Goias, and from there, with the streams serving as dividers, back to the point of beginning.

Defendants' Exhibit F Attached to Affidavit of Keith Rosenn, Document No. 70, at 3–4. Here again, the translator inserted the parenthetical [sic: "Pratinha"] following the word "Prainha."

The civil action was initially dismissed, but an appellate court subsequently held that the dismissal was in error. The appellate court's decision, issued on October 5, 1978, remanded the case to the lower court for further proceedings. However, no further action has been taken in the case.

In the mid–1970s, Smith became concerned about the time and expense required to comply with Brazil's new laws requiring foreign landowners to take various types of action on their land. To resolve his dilemma, Smith entered into an agreement with defendant Eldon Anson on December 23, 1975. Plaintiff's Appendix, at 27–31. The agreement gave Anson an option to purchase 332,000 acres of Pratinha for 15 cents per acre, with $10,000 being paid upon execution of the agreement and the balance within two years. *Id.* at 27. The sale was contingent upon Smith obtaining good and transferable title to the property. *Id.* at 28. Anson was to act on Smith's behalf to have the entire

tract of property surveyed, pay taxes, and register the land with the National Institute of Colonization and Agrarian Reform (INCRA), the government agency controlling Brazil's rural lands. *Id.* at 29–30.

In conjunction with the agreement, Smith gave Anson a power of attorney to accomplish his tasks in Brazil. Plaintiff's Appendix, at 25. However, Anson subsequently reported that he needed a much broader power of attorney, referred to as an a power of attorney *in rem propriam,* or *em causa propria* in Portugese. Smith, therefore, executed a power of attorney *in rem propriam* on February 24, 1976. Plaintiff's Appendix, at 36.

Smith's attorney, defendant Don Prosser, was involved in drafting the power of attorney *in rem propriam.* Because the document granted such broad powers, Prosser also drafted a trust agreement which provided, *inter alia,*

2. The parties acknowledge that under Brazilian law, the Power of Attorney referenced in Paragraph 1 grants to ELDON T. ANSON the power to convey the entire premises known as the Fazenda "Pratinha".... The parties hereby agree that ELDON T. ANSON and PHYLLIS J. ANSON hold in trust as the trust estate for the benefit of ED SMITH that portion of the Fazenda Pratinha reserved by ED SMITH in the Agreement for the Sale of Real Estate, dated December 23, 1976 [sic]. ...

3. The parties agree that the trustee(s) shall not sell, assign, mortgage, pledge or otherwise convey or encumber the trust estate without written instruction from ED SMITH.

Plaintiff's Appendix, at 37–38.

The agreement between Smith and Anson expired by its own terms in December 1977. Because Anson still desired to buy the property, the parties entered into a new agreement on January 20, 1978. Plaintiff's Appendix, at 44–52. The new agreement required Anson to pay an additional $10,-000 upon execution of the agreement and another $25,000 on or before July 17, 1978. *Id.* at 45. The agreement further provided that Anson was to provide proof that he

had completed certain tasks by that date, including payment of taxes, clearing the title, and removing squatters. *Id.* at 45–46.

Smith also executed an amendment to the power of attorney *in rem propriam.* Plaintiff's Appendix, at 42–43. The amended power strictly limited Anson's authority to the following acts: (1) to register the property; (2) to institute or defend legal proceedings to clear title to the property; (3) to satisfy outstanding claims or encumbrances against the property; (4) to establish a development plan for the farm, as required by the Brazilian laws; and (5) to lawfully evict squatters and strangers. *Id.* at 42. The amended power of attorney further stated that the power of attorney executed on February 24, 1976, as amended, "does not authorize or permit the transfer of title or ownership of the Fazenda "Pratinha" from Ed Smith...." *Id.* at 43. Finally, the document provided that the power of attorney was to terminate on July 17, 1978.

The amended power of attorney was given to Anson, but he did not return the original power of attorney to Smith or Prosser. For reasons that are disputed by the parties, the amended power of attorney was never recorded.

The parties subsequently extended their agreement, allowing Anson to provide proof that he had completed certain acts by January 23, 1979, and others by April 24, 1979. Plaintiff's Appendix, at 54. When Anson failed to meet the January 23 deadline, Smith sent Anson a letter, dated February 9, 1979, declaring Anson to be in default and thereby forfeiting his rights under the agreement. Plaintiff's Appendix, at 108–09.

Among the deficiencies noted by Smith was Anson's failure to pay the taxes on Pratinha. The record indicates that attorney Joao Gomes Netto brought a civil action in Smith's name to pay to deposit the taxes with INCRA. Defendants' Exhibit D Attached to Affidavit of Keith Rosenn, Document No. 70. However, the Bahia court dismissed the action on November 14, 1979, on the grounds that (1) there had been no taxes assessed for the property;

and (2) the state had instituted an action to nullify title to Pratinha. With respect to this latter finding, the Court stated: "[T]his area of property is under judicial proceedings, with a strong argument that it has been acquired by fraudulent means, even though theoretically, the title documents prevail or are in effect until they have been definitively cancelled. It is prudent not to regularize tax situations capable of presenting a good opportunity for new real estate operations on these lands prior to a definitive solution of the pending judicial proceedings." *Id.* at 2–3.

Another deficiency listed by Smith was Anson's failure to account for his use of the power of attorney. Plaintiff's Appendix, at 109. "Your accounting of the use of power of attorney is inadequate in that you stated in our meeting that you have never pledged or contracted lands of the Pratenha [sic] Fazenda when I have reason to believe that you have offered and pledged such land to third parties." *Id.*

The current title registration for Pratinha indicates that the property was sold to Joaquim Sirqueira Sobrinho of Brazil in accordance with a private instrument dated October 10, 1979. *See* Plaintiff's Appendix, at 7–8; Defendants' Exhibit B Attached to Affidavit of Keith Rosenn, Document No. 70. This sale is noted in the margin of Smith's recordation of title. Also noted in the margin is a power of attorney *em causa propria* which Anson transferred to Dr. Getulio Vieira de Aguiar "all powers in causa propria" that had been granted to Anson by Smith.

Although the property was sold in 1979, Smith alleges that he did not become aware of the sale until he had a title search run in 1987 upon finding another potential buyer for the property. Smith filed this lawsuit on September 12, 1988, seeking damages from Anson and his wife, as well as from attorney Prosser and the law firms in which Prosser was employed.

Separate motions for summary judgment were filed by Phyllis Anson, individually and as executor of the estate of the deceased Eldon T. Anson (Document No. 75), Don Prosser and his law firms (Document Nos. 70, 101 and 103) and the plaintiff (Document No. 84). Because a settlement has been reached between the plaintiff and Phyllis Anson (*See* Motion for Finding of Good Faith, Document No. 122), the Court hereby DENIES the Anson motion for summary judgment as MOOT. Accordingly, the Court's discussion below is restricted to the issues raised in the Prosser motions.

## II. ANALYSIS

A court may grant summary judgment only if the party seeking summary judgment demonstrates that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 841 F.2d 1347, 1354 (7th Cir.1988). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988). Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered even if the opposing party fails to respond to the motion. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1222 (7th Cir.1984).

When the parties do not dispute the factual basis of a motion for summary judgment, the court's only inquiry is whether judgment should issue as a matter of law. The burden of proof on this matter rests with the moving party. Summary judgment is inappropriate, however, if the parties disagree about inferences reasonably to be drawn from undisputed facts. *Bowyer v. United States Dep't of Air Force*, 804 F.2d 428, 430 (7th Cir.1986).

When the parties dispute the facts, the parties must produce proper documentary evidence to support their contentions. The parties cannot rest on mere allegations in the pleadings, *Boruski v. United States*, 803 F.2d 1421, 1428 (7th Cir.1986), or upon conclusory allegations in affidavits. *First*

*Commodity Traders, Inc. v. Heinold Commodities,* 766 F.2d 1007, 1011 (7th Cir. 1985). The Court must view the evidence and any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), as long as the inferences are reasonable. *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988). The non-moving party must show that the disputed fact is material; that is, it must be outcome-determinative under the applicable law. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986).

## A. Defendants' Motions

The defendants filed two motions for judgment on the pleadings based upon a recent Illinois Supreme Court decision which held that attorney malpractice actions that seek recovery for only economic loss must be based upon contract, rather than upon tort. *See Collins v. Reynard,* No. 70325 (Ill. October 31, 1991). Pursuant to this decision, the defendants argue that Count III of the plaintiff's third amended complaint must be dismissed because it is based upon a tort theory of malpractice. They further argue that Count VI, which is based upon contract, is barred by the five-year statute of limitations. Ill.Rev.Stat. ch. 110, ¶ 13–205 (1989).

As a preliminary matter, the Court notes that the Illinois Supreme Court granted a petition for rehearing in *Collins* on February 2, 1992. Oral arguments were heard in May and the case is currently on the state court's advisement docket awaiting an opinion. As a result, the original *Collins* opinion has not yet been published in the permanent law reports and may be revised or withdrawn at any time before publication.

The rehearing granted in *Collins* does not preclude this Court from applying the decision. As two federal courts noted with respect to another case that was on rehearing before the state supreme court, the original opinion "clearly indicates how the Supreme Court of Illinois would resolve the issue confronting this court; if the Illinois Supreme Court later revises or withdraws the ... opinion, this court's order may be modified accordingly." *Doran v. Corn Products–U.S.,* 776 F.Supp. 368, 372 n. 2 (N.D.Ill.1991) (quoting *Kalp v. American Nat'l Can Co.,* No. 90–4910, slip op. at 2, 1991 WL 86096, 1991 U.S.Dist. LEXIS 6763 (N.D.Ill. May 17, 1991)).

The Court must determine, however, whether *Collins* should be applied retroactively to the case at bar, or only prospectively. The *Collins* decision provides no guidance as to whether the decision has retroactive effect. Therefore, the Court looks to the test for prospective application, as enunciated in *Elg v. Whittington,* 119 Ill.2d 344, 357, 116 Ill.Dec. 252, 258, 518 N.E.2d 1232, 1238 (1988).

> Whether the rule will be applied prospectively will depend upon whether: "the decision to be applied retroactively ... establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed".... If this criteria is met, the question of prospective or retroactive application will be answered by considering (1) whether, given the purpose and history of the rule, its operation will be retarded or promoted by prospective or retroactive application and (2) whether prospective application is mandated by the balance of equities.

*Id.* (citations omitted).

The Court finds that the first part of this test is met. The *Collins* decision is an outgrowth of the Illinois Supreme Court's ruling in *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), which held that a plaintiff could not use a tort theory in a product liability action where the plaintiff had suffered only economic, or commercial loss, as opposed to personal injury or physical injury to property. In subsequent decisions, the court applied the *Moorman* doctrine to actions against non-lawyer professionals such as architects, contractors and

builders. *See, e.g., 2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990); *Anderson Elec. Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986); *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 Ill.2d 87, 96 Ill. Dec. 939, 492 N.E.2d 181 (1986). However, these decisions did not clearly foreshadow the state supreme court's decision to apply the *Moorman* doctrine to attorneys. In fact, the court's most recent pre-*Collins* opinion stated, albeit in dicta, that

> While we do not intend in the present case to determine the future application of *Moorman* in all areas of professional malpractice, we must reject the plaintiff's theory that denial of the negligence claim against the present architect would signal in general the end of malpractice recovery in tort.... [W]e believe that other professional relationships are readily distinguishable from the present case. For example, since *Moorman*, malpractice actions against attorneys have gone forward, without any suggestion that the form of recovery traditionally recognized in such actions would no longer be allowed.

*Lincoln Park*, 136 Ill.2d at 317–18, 144 Ill.Dec. at 234, 555 N.E.2d at 353. Therefore, until *Collins* was decided, litigants had no reason to deviate from the traditional practice of using tort law to resolve claims of attorney malpractice. *See Collins*, at 12 (Miller, C.J., dissenting) ("Indeed, since *Moorman*, and until today's decision, this court has continued to permit attorney malpractice actions sounding in negligence to proceed on that ground, without ever intimating that this more familiar tort-based theory of recovery should no longer be available.").

The second step of the *Elg* analysis presents a more difficult question. As a general matter, the Court finds that the plaintiff would not suffer undue hardship by proceeding under the substantive law of con-tract, rather than tort. Although proceeding under a contract theory may affect the type of damages that the plaintiff would recovery, the plaintiff is not left without a remedy. The Court also finds that retroactive application of *Collins* would promote, rather than retard, the Illinois Supreme Court's rationale in *Collins*—i.e., that "[c]ontract law provides a superior basis to tort law for the resolution of issues concerning the failed expectations of clients of professionals where only economic loss is sought to be recovered." *Collins*, at 7.

The plaintiff would suffer great hardship, however, with respect to the applicable statute of limitations. Although the plaintiff's cause of action would fall under the five-year statute of limitations regardless of whether it is brought in contract or in tort, a great disparity exists as to when the cause of action accrues under each theory. Illinois courts have long recognized that the statute of limitations begins to run in a negligence action when the plaintiff "discovers" the wrong. This "discovery rule" has been applied in legal malpractice actions. *See Belden v. Emmerman*, 203 Ill.App.3d 265, 148 Ill.Dec. 583, 560 N.E.2d 1180 (1st Dist.1990). However, the rule does not apply to contract actions. *Rock Island Bank v. Aetna Casualty & Surety Co.*, 692 F.2d 1100 (7th Cir.1982).

Applicability of the discovery rule is crucial to the plaintiff's action because the defendants' breach of contract occurred with acts or omissions that took place in the mid– to late–1970s when the power of attorney *in rem propriam* was drafted and used. Assuming that Prosser breached a contractual duty by failing to retrieve the 1976 power of attorney from Anson, this breach continued, at the very latest, to 1979 when Anson used the power to sell the property. Thus, if the discovery rule is inapplicable, the plaintiff's action would have been barred in 1984. The plaintiff escapes this bar only by alleging that he did not discover the sale of the property until he ran a title search in 1987.[1] There-

---

**1.** The defendants argue that the plaintiff knew or should have known of the injury prior to that date. Although the defendants make a valid argument based upon the documentary evi-

fore, the plaintiff would be left without a remedy in this case if the statute of limitations for contracts is applied.

The United States Supreme Court was faced with a similar situation in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).[2] Shortly before *Chevron*, the Supreme Court had held that admiralty law was inapplicable to cases under the Outer Continental Shelf Lands Act. *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). One effect of *Rodrigue* was to prohibit the use of the equitable doctrine of laches. Thus, the district court in *Chevron* held that Louisiana's one-year statute of limitations, rather than the admiralty doctrine of laches, governed the case and barred the plaintiff's action. The Supreme Court disagreed, holding that *Rodrigue* should not be invoked to require application of the Louisiana statute of limitations retroactively.

In this case, as in *Chevron*, "[i]t would produce the most 'substantial inequitable results' ... to hold that the [plaintiff] 'slept on his rights' at a time when he could not have known the time limitation that the law imposed upon him." *Chevron*, 404 U.S. at 108, 92 S.Ct. at 356. Retroactive application of the statute of limitations "would deprive the [plaintiff] of any remedy whatsoever on the basis of superseding legal doctrine that was quite unforeseeable." *Id.* The unfairness of this result is underscored by the fact that the plaintiff has incurred great expense to bring this action, including the costs of obtaining and interpreting Brazilian court documents. In fact, had it not been for the delays neces-

sary to obtain and interpret such documents, the case would have been resolved long before *Collins* was decided.

■ The Court, therefore, holds that the rules governing the statute of limitations for contract actions shall not be applied retroactively to legal malpractice actions. The plaintiff may rely upon the discovery rule to bring his cause of action within the five-year limitations period. The Court, however, holds that *Collins* will be applied to this case retroactively with respect to the substantive law.[3] Accordingly, the Court DENIES the defendants' motion for judgment on the pleadings on Count VI of the plaintiff's third amended complaint (Document No. 103), but GRANTS the motion for judgment on the pleadings on Count III (Document No. 101).

In so holding, the Court's ruling will not retard operation of the rule announced in *Collins*. The Court is following *Collins's* mandate that legal malpractice actions be limited to contractual remedies; the Court's action merely provides that the plaintiff is not barred by a statute of limitations that was inapplicable at the time that he brought his suit.

The defendants' motion for summary judgment raises the issue of whether the plaintiff has suffered any damage as a result of the defendants' alleged malpractice. First, the defendants argue that the plaintiff never had good, marketable title in Pratinha. Secondly, they argue that the plaintiff suffered no damage as a result of any act or omission by the defendants because the power of attorney that Anson

---

dence before the Court, this fact is disputed by the plaintiff's own testimony. Because the Court must accept the plaintiff's evidence as true on a motion for summary judgment, the Court finds that there exists a genuine issue of material fact as to when the plaintiff discovered the wrong.

**2.** The *Chevron* case first enunciated the three-part test for determining whether a civil law ruling will have prospective, rather than retroactive, application. The Supreme Court recently rejected this test, with a plurality of the Court holding that a new rule of civil law should be applied retroactively in all cases when the rule was applied to the litigants in the case in which

the rule was developed. *James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). *Beam*, however, applies only to cases based upon federal law. In diversity cases, the retroactive or prospective application of a new rule of law is governed by state law. Thus, the Court finds that the three-part test enunciated in *Elg* is still applicable to the case at bar.

**3.** *See Chevron*, 404 U.S. at 108 n. 10, 92 S.Ct. at 356 n. 10 ("Retroactive application of all state substantive remedies ... would not work a comparable hardship....").

used to convey the property was null and void *ab initio*.

In support of their first argument, the defendants argue that Manoel Berilo Gomes Dias's criminal conviction conclusively establishes the fact that Smith obtained only a fraudulent title to Pratinha. This argument is based upon Article 1525 of the Brazilian Civil Code, which provides that "[c]ivil liability is independent of criminal liability; however, one cannot continue to question the existence of acts or who performed them when these questions have been decided in a criminal proceeding." Defendants' Exhibit F Attached to Reply Affidavit of Keith Rosenn, Document No. 112. Because Manoel Berilo Gomes Dias was convicted of fraudulently creating the title to Pratinha, the defendants contend that the plaintiff cannot challenge this fact in a civil action.

The plaintiff argues that the order of conviction refers to Manoel Berilo Gomes Dias's actions in the summary probate of the property "Prainha" and not Pratinha. Thus, the plaintiff contends that the conviction relates to an entirely different parcel of property and, as a result, does not establish the falsity of Smith's title to Pratinha. The Court, however, agrees with the defendants that the reference to Prainha was a typographical error. When all of the court documents are read in context, it is clear that Manoel Berilo Gomes Dias, Iraci Resende, and Gerson de Castro Costa were indicted for fraudulently creating the title to Pratinha and that Manoel Berilo Gomes Dias and Iraci Resende were ultimately convicted upon the charges in the indictment.

■ Based upon Article 1525 of the Brazilian Civil Code, the Court finds that the plaintiff cannot challenge the fact that the title to Pratinha was fraudulently created. However, the Court rejects the defendants' argument that the plaintiff suffered no damage because he lacked good marketable title to the property. The defendants contend that the title was void *ab initio*. However, no Brazilian court has ever nullified Smith's title. In fact, although the court in Bahia refused to accept Smith's attempt to deposit his taxes with INCRA, the court did not find Smith's title null and void. Rather, the court referred to the pending state action to nullify the title and stated that there was "a strong argument that it has been acquired by fraudulent means even though theoretically, the title documents prevail or are in effect until they have been definitively cancelled." This order was entered in November 1979, which was more than a year after Manoel Berilo Gomes Dias's conviction. Thus, it is significant that the Bahia court, although bound by the preclusive effect of this conviction, did not find that Smith's title was null and void *ab initio*.

It is equally significant to note that the state of Bahia has not pursued its action to nullify the title to Pratinha during the past 13 years and it is questionable whether it will ever do so. Therefore, until Anson used the power of attorney *in rem propriam* to transfer Pratinha, Smith still held title to the property. Bahia's lawsuit presented a cloud on that title and clearly diminished its value. However, it would not have prevented Smith from exercising possession over the land until such time, if any, that the title was nullified. Smith, therefore, suffered some damage as a result of Anson's sale of the property. The value of being deprived of that clouded title is a question of fact for the jury to determine.[4]

---

4. The plaintiff argues that he obtained title by usucapio (the equivalent of the American doctrine of adverse possession) pursuant to Article 551 of the Brazilian Civil Code, which provides that a person acquires the ownership of real property when he "possesses it as his own, continuously and without opposition, with just title and good faith" for a period of "ten years as between persons present, or twenty years between absentees...." Defendants' Exhibit F Accompanying Reply Affidavit of Keith Rosenn, Document No. 112. The Court disagrees. First, Smith did not possess the property without opposition because the state of Bahia filed its lawsuit to nullify the title within seven years after Smith purchased the property. Secondly, it appears well-established under Brazilian law that the principle embodied in Article 551 does not apply to state lands. The defendants point out—and the plaintiff does not dispute—that there are numerous decisions of the Brazilian Federal Supreme Court holding that title to pub-

Similarly, the Court rejects the defendants' argument that Smith suffered no damages because the power of attorney *in rem propriam* was void under Brazilian law. Even assuming that a Brazilian court would find that the power of attorney was void, the fact remains that Anson used the power to sell Pratinha. Smith, at the very least, must incur the costs and expenses of the legal proceedings necessary to void any transactions based upon the power of attorney and to clear the title of the clouds caused by Anson's use of the power. Therefore, it is incorrect to assume that Smith suffered no damage. Here again, however, the value of such damages present a question of fact for the jury. Accordingly, the Court hereby DENIES the defendants' Motion for Summary Judgment (Document No. 70).

B. Plaintiff's Motion for Summary Judgment

In addition to the questions of fact identified above, the Court also finds that there is a genuine issue of fact with respect to plaintiff's breach of contract allegations against attorney Prosser and his law firms. Accordingly, the Court DENIES the plaintiff's motion for summary judgment.

### III. SUMMARY

For the foregoing reasons, the Court hereby DENIES the defendants' Motion for Summary Judgment (Document No. 70) and motion for judgment on the pleadings on Count VI of the plaintiff's third amended complaint (Document No. 103), but GRANTS the motion for judgment on the pleadings on Count III (Document No. 101).

The Court further DENIES Phyllis Anson's motion for summary judgment (Document No. 75) as MOOT.

IT IS SO ORDERED.

lic land cannot be acquired by usucapio. This rule was codified in the 1988 Brazilian Constitution, which provides that "[p]ublic lands may not be acquired by usucapio." Brazilian Constitution of 1988, Art. 183, § 3, Defendants' Exhibit H Attached to Reply Affidavit of Keith Rosenn.